Carolyn J. Johnsen (AZ 011894)
Katherine A. Sanchez (AZ 30051)
**DICKINSON WRIGHT PLLC**
1850 North Central Avenue, Suite 1400
Phoenix, Arizona 85004
Phone: (602) 285-5000
Fax: (844) 670-6009
cjjohnsen@dickinsonwright.com
ksanchez@dickinsonwright.com
*Attorneys for the Official Committee of Unsecured Creditors*

### IN THE UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 Proceeding |
| CORE RESOURCE MANAGEMENT, INC., | No. 2:16-bk-06712-BKM |
| Debtor. | **MOTION FOR AUTHORITY TO PURSUE ACTIONS AGAINST ANTHONY DEMASI AND GOLDMAN ADVISERS, LLC aka GOLDMAN LEGAL ADVISERS**<br><br>Proposed Hearing Date: February 16, 2017<br>Proposed Time: 2:00 p.m. |

The Official Committee of Unsecured Creditors (the "Committee") files this *Motion for Authority to Pursue Actions Against Anthony Demasi and Goldman Advisers, LLC* (the "Motion") seeking Court authority to file additional causes of action against Anthony Demasi ("Demasi") and Goldman Advisers, LLC, ("Goldman") to include: (a) avoidance actions pursuant to 11 U.S.C. §§ 542, 547, and 548; (b) subordination under 11 U.S.C. § 510; (c) fraud; (d) disgorgement; and (e) any additional actions held by the estate.

The Committee filed a Complaint against Demasi and Goldman on December 9, 2015 (2:16-ap-00585-BKM) (attached hereto as <u>Exhibit A</u> and incorporated herein by reference). The Complaint alleges essentially that: 1) Goldman's purported secured claim is invalid and enforceable because it is based on improperly filed mechanic's liens; and 2) Demasi's and Goldman's claims must be disallowed because they are based on contracts in which they were hired to and did engage in the unauthorized practice of law and as such are void; and, 3) that even if the basis of the claims

can be substantiated, Demasi and Goldman were not owed any monies.

The Committee believes that these facts also support claims for avoidable transfers and the disgorgement of payments made to Demasi and Goldman. As detailed below, the Committee has requested the Debtor to pursue these transfers. The Debtor has refused and is now seeking Court approval of a settlement of these claims –a settlement to which the Committee is not a party despite the fact it is the Plaintiff in the Adversary Proceeding and the Debtor is not a party in that lawsuit. The Committee will file a separate objection to the settlement.

More important, as described the Committee has now discovered that Demasi and Goldman were engaged in a scheme through which they established a separate entity to file false mechanic's liens in an effort to defraud creditors. The depth to which these actions were known by the Debtor's board is unknown but certainly must be discovered. In any event, it is futile to rely on the Debtor to prosecute these actions.

Therefore, the Committee seeks standing to file all appropriate actions against Demasi and Goldman to recover on behalf of the estate all improperly transferred funds and damages and to subordinate to the extent necessary any claims and interests they might assert.

**PROCEDURAL AND FACTUAL BACKGROUND**

1. On June 13, 2016, Core Resource Management, Inc. (the "Debtor") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

2. The Debtor continues to operate its business and manage its property as debtor and debtor-in-possession under Bankruptcy Code §§ 1107(a) and 1108.

3. The Debtor is in the business of oil production and owns a number of wells and/or leasehold interests for wells located in Oklahoma.

4. On July 15, 2016, the United States Trustee, appointed the Committee. The Committee's members are: Mary Ann Kestner, Anita J. Harlan and John Leggat. Doc. No. 33. A fourth member Now CFO was added on September 22, 2016. Doc. No. 98.

**Cash Collateral Orders**

5. On June 30, 2016, Debtor filed its *Emergency Motion for Adequate Protection*. [Dkt. #17].

6. On July 5, 2016, Goldman filed three proofs of claim identified in the Court Claims Register as Claims 2, 3, and 4. The claims are duplicates of one another and constitute one claim (Claim 3, referred to as the "Goldman POC" is attached to the Complaint as Exhibit A).

7. Through the Goldman POC, Goldman states that it is owed $107,888.00, consisting of a secured claim in the amount of $83,688.00 and an unsecured claim in the amount of $24,200, a portion of which is asserted as a priority wage claim under 11 U.S.C. § 507(a)(4).

8. Goldman's secured claim is based on two Mechanic's Liens (the "Goldman Liens") filed against certain of the Debtor's oil wells. One was filed on September 14, 2015 in the amount of $52,104.00 and the other on April 4, 2016 in the amount of $31,584.00. *See* Goldman POC, pps.34 - 35.

9. After an emergency hearing held on July 5, 2016, the Court entered its *Interim Order (A) Authorizing the Use of Cash Collateral; and (B) Determining Sufficiency of Adequate Protection* ("Interim Order"). Doc. No. 29. The Interim Order authorized the Debtor to use cash collateral in accordance with an attached budget and required the Debtor to segregate $2,000 per month for the benefit of Goldman. The Interim Order granted replacement liens to Goldman and other pre-petition secured lenders "to the extent of cash collateral used by Debtor and to the extent each may have a valid and perfected security interest or lien as of the petition date in Debtor's assets." Interim Order at ¶ 6.

10. A final hearing was held on July 21, 2016 and on August 3, 2016, the Court entered its *Final Order (A) Authorizing the Use of Cash Collateral; and (B) Determining Sufficiency of Adequate Protection.* Doc. No. 51.

11. On August 15, 2016, the Committee filed its *Motion for (1) Reconsideration of Final Order (A) Authorizing the Use of Cash Collateral; and (B) Determining Sufficiency of Adequate Protection; (2) Declaration that Property is Not Cash Collateral; and (3) Demand for Turnover of Estate Property* ("Reconsideration Motion") requesting the opportunity to be heard as counsel had been retained the day before the entry of the Final Order.

12. In the Reconsideration Motion, the Committee argued that the Goldman Liens were invalid in that Goldman had not provided the kind of services that would justify placing liens on the

Case 2:16-bk-06712-BKM    Doc 204    Filed 01/30/17    Entered 01/30/17 19:02:02    Desc
Main Document    Page 3 of 18

Debtor's oil wells, and thus, the Goldman Liens are not enforceable under Oklahoma law.

13. After further briefing the Court held a hearing on October 13, 2017 at which time the Court determined that additional evidence would be required and that the matter should be addressed in an adversary proceeding. The Committee agreed to file such a complaint.

**The Complaint and its Basis**

14. On December 9, 2016, the Committee filed a Complaint against Anthony DeMasi and Goldman Advisers, LLC aka Goldman Legal Advisers. The Committee alleges four counts: Count One against Goldman challenges the validity of the Goldman Liens. Count Two against Goldman and Count Three against Demasi allege objections to their filed proofs of claim on the grounds that no money is owed and that the contracts on which the claims are based are void as a a matter of law. Count Four against Goldman and Demasi is a demand for an accounting.

**Proofs of Claim and Interests filed by Defendants Goldman and Demasi**

15. As discussed above, the Goldman POC asserts a priority wage claim, a general unsecured claim and a secured claim.

16. On December 7, 2016, Demasi filed proof of claim number 31 (the "Demasi POC"). Demasi states that he is owed $75,900, $12,850 of which is asserted as a priority claim. The Demasi POC is attached to the Complaint as Exhibit B.

17. On December 7, 2016, Goldman filed proof of interest number 30 (the "Proof of Interest"). Goldman states that it owns 160,000 shares of the stock of the Debtor. The Proof of Interest is attached to the Complaint as Exhibit C.

**Agreements for Provision of Legal Services**

18. The Goldman POC is based on a Consulting Agreement dated July 1, 2014. The document is titled "Consulting Agreement between Core Resource Management, Inc. and Goldman Legal Advisers, LLC ("Consulting Agreement"). See POC 3 beginning at p. 6.

19. Demasi signed the Consulting Agreement on behalf of Goldman and it appears throughout the entire time period in question they were acting as one in the same.

20. The Consulting Agreement provided that Goldman would provide service including "Advising re Corporate Governance and Due Diligence, Advising and subsequent Documentation of

Corporate Legal Matters, Advising and Documentation re: Regulatory Compliance Legal Work, Legal Document Drafting …" Goldman POC 3, p.6. Services included "Corporate Legal Advisory needs." Goldman POC 3, p. 7.

21. Goldman claims it provided service in accordance with the Consulting Agreement and Demasi acted on behalf of Goldman in providing such services.

22. The Demasi POC is based on an "Employment Agreement between Core Resource Management, Inc. and Mr. Anthony Demasi" dated July 1, 2014 (the "Employment Agreement"), attached to the Demasi POC. The Employment Agreement is also attached to the Goldman POC.

23. The Employment Agreement provided that Demasi's duties included serving as "Legal Adviser," managing all corporate in-house legal needs such as "complex legal drafting," negotiating and drafting contracts. Demasi POC, p. 6.

24. The Goldman POC also includes a "Secured Settlement Agreement and Release," Goldman POC, p. 41. The Settlement Agreement signed by Demasi indicates it is by and between Goldman, "a legal and financial consultant," and that "Goldman performed legal and financial advisory services" for the Debtor.

25. As set forth therein, the POC's collectively and individually illustrate that Goldman and Demasi intended to and did in fact provide legal services and advice to the Debtor.

26. The Committee believes that the Debtor expected Goldman and Demasi to provide it with legal advice and to perform its legal work.

27. As part of the Goldman POC, Goldman itemized invoices for "Goldman Legal Advisers, LLC" dated December 1, 2015, January 1, 2016, May 1, 2016 and June 1, 2016 (collectively the "Invoices"). Goldman POC at 48. The Invoices reflect that Goldman and Demasi were providing legal services to the Debtor including, among other examples "drafting legal letters" and "draft rule 144 legal opinion letter." Demasi has failed to provide any invoices in his POC to substantiate his claim.

**Unauthorized Practice of Law**

28. Goldman is a Michigan Limited Liability Company formed in December 2013. Its Articles of Organization filed with the Michigan Department of Licensing and Regulatory Affairs

filed January 13, 2014 show that the word "Legal" was deleted from the name Goldman Legal Advisers, LLC. (See Exhibit B).

29. Goldman maintained an office in the Debtor's place of business at 3131 Camelback Road, Phoenix, Arizona, and in fact as of October 13, 2016, four months after the Debtor filed its bankruptcy petition, Goldman listed on its website the Debtor's place of business as one of its offices.

30. Demasi was disbarred from practicing law by the Illinois Supreme Court effective January 21, 2010, well before his engagement by the Debtor. The Illinois records show that he has not been re-instated. (*See* Exhibit C)

31. A review of the Arizona State Bar public records indicates that Demasi is not and has never been licensed to practice law in the State of Arizona.

32. The Consulting Agreement and the Employment Agreement on which Goldman and Demasi base their claims were agreements by non-lawyers to provide legal services. They were agreements to engage in the unauthorized practice of law and therefore are null, void, and unenforceable ab initio. 7 C.J.S. Attorney & Client § 49; *see also Landi v. Arkules*, 172 Ariz. 126, 835 P.2d 458 (Ariz. App. 1992)(acting as a private investigator without a license rendered contract void and unenforceable under Arizona law).

33. Goldman and its managers, members and employees knowingly did engage in the unauthorized practice of law in the State of Arizona by providing legal services to the Debtor.

34. Goldman and Demasi charged the Debtor monies for providing legal services to the Debtor.

35. To the extent Goldman relies on or asserts the Settlement Agreement as a basis for its claim, it too, is null, void, and unenforceable ab initio in that it is a product of Goldman's unauthorized practice of law.

36. As further evidence of the unauthorized practice of law, attached as Exhibit D is a letter from Demasi to the Arizona Attorney General stating "We are representing Mr. James Clark[1]

---

[1] James Clark is the name of a former CEO of the Debtor and his father.

regarding the above-referenced civil matter . . ." The letterhead on the letter is "Goldman Legal Advisers, LLC."

37. The Consulting Agreement, the Settlement Agreement and the Goldman POC are against public policy and unenforceable. See *Carter v. Flaherty*, 953 N.Y.S. 2d 814, 37 Misc. 3d 46,48 (NY 2012) (contracts for the provision of legal services are invalid as against public policy and the courts will not enforce them; *In re Heritage Organization, LLC*, 354 B.R. 407, 433 (Bankr. N.D. Texas 2006 (courts will not aid in the enforcement of a contract made for the illegal practice of law); see also *Landi v. Arkules*, 172 Ariz. 126, 835 P.2d 458 (Ariz. App. 1992).

38. Because the Consulting Agreement and the Employment Agreement are not enforceable, the Debtor's estate should be allowed to pursue any and all of the amounts paid to Goldman and Demasi. The Committee believes these amounts total over $200,000.00.

**No Monies Owed**

39. Even if the Court finds that the Consulting Agreement and the Employment Agreements are enforceable, according to the books and records of the Debtor, the Debtor does not owe any monies to Goldman or Demasi.

40. The memo attached as Exhibit E is a comprehensive summary of the payments to Goldman/Demasi prepared by the Debtor's chief financial officer. The memo concludes with "it appears Tony has been paid in full for 2014 and 2015 based on the invoices he submitted." In fact, as set forth in more detail below, Goldman was overpaid by at least $100,000.

41. In addition, in its October Monthly Operating Report, signed by the Debtor's CEO and CFO, Debtor states that "[t]he court is yet to deal with the primary issues regarding Goldman Legal Services and Now CFO not turning over their work product and ruling on their false claims as creditors." See Doc. No. 200 at p.7, attached as Exhibit F.

42. By its own admission, the Debtor does not believe Goldman and Demasi have legitimate claims.

**The Goldman Liens**

43. Goldman has asserted that a portion of its Claim is secured by the Debtor's Quinlan and Giant Leasehold interests located in Oklahoma. Goldman POC, p. 34.

44. In the Mechanic's Lien Statement of Claim recorded against the Quinlan Lease, Goldman asserted that it was owed $52,104.00 for work performed and work product supplied up until August 30, 2015 ("Lien #1"). The Statement is signed by Demasi who swore under oath that the items of the account "are just, true, and correct."

45. In the second Mechanic's Lien Statement of Claim recorded against the Giant Lease, Goldman asserted that it was owed $31,584.00 for work performed and work product supplied up until March 30, 2016 ("Lien #2"). The Statement is signed by Demasi who swore under oath that the items of the account "are just, true, and correct."

46. At the time Liens #1 and #2 were recorded, Debtor did not owe Goldman any monies.

47. The Invoices filed by Goldman do not include any entries related to any work performed for any specific leasehold interest.

48. The Goldman Liens never attached to any property of the Debtor because they are not authorized under the Oklahoma lien statute. Specifically, the statute requires that the person or company asserting a lien have provided labor or services for the specific leasehold interest on which it claims a lien. "Any person…who shall, under contract…with the owner of any leasehold for oil and gas purposes…perform labor or services….shall have a lien upon the whole of such leasehold….for which said material and supplies were furnished or labor or services performed." 42 O.S. § 144 (emphasis added), *In re George Rodman, Inc.*, 38 B.R. 822, 823 (Bankr.W.D.Okla. 1984).

49. Goldman did not provide, nor did the Goldman Consulting Agreement contemplate, that the services provided to the Debtor would relate to the Leasehold Interests. Instead, the services provided were general consulting services for Debtor's business. General business services to the owner or operator of a leasehold interest do not give rise to a mechanic's lien under the Lien Statute. *See Stillwater Nat. Bank & Trust Co. v. Cook*, 257 P.3d 427, 430 (Okla.Civ.App. 2011)(denying mechanic's lien to architect who provided plans but due to developer's inability to construct architect's design did not benefit the property); *In re Bunker Exploration Co.*, 48 B.R. 708, 711 (Bankr.W.D.Okla. 1985)(rendering of title opinion does not constitute services that give rise to a lien); *see also In re Producers Energy Corp.*, 11 B.R. 669, 673-674 (Bankr.W.D.Okla. 1981)(supplier not entitled to mechanic's or materialmen's lien for materials supplied after coal mine

went into full operation and not furnished for use during developmental stages); *Browning v. Allied Helicopter Service, Inc.,* 309 F.2d 712, 715 (10th Cir. 1962)(finding that aerial spraying of timber and bush did not give rise to a mechanic's lien); *Brinson-Kirtley Lead & Zinc Co. v. Kirtley*, 237 P. 457, 459 (Okla. 1925)(uncompensated services provided by manager of company not protected by mechanic's lien statutes).

50. The Goldman Liens fail because Goldman did not provide services on the Quinlan Lease or the Giant Lease but generally to the Debtor.

### The Fraudulent Conveyances

51. Even if the Court determines that the Goldman and Demasi Agreements are valid and enforceable, the Debtor's records reflect that the Debtor paid to Goldman $31,099 in 2014 prior to the execution of any agreement.

52. Goldman's Consulting Agreement provided for it to be paid a monthly fee of $5,200. Thus, for the 6 months of 2014 that the Consulting Agreement was in effect, Goldman was owed $31,200. The Debtor paid Goldman $102,008.98, an overpayment of $70,808.98.

53. Similarly, for 2015, the Debtor owed $62,400 and paid Goldman $91,586.98 resulting in an overpayment of $29,186.98.

54. These over payments were made to Goldman without consideration and are recoverable as fraudulent conveyances.

55. Further, the Debtor's records reflect that multiple payments made to Goldman were sporadic and outside the ordinary course of business. They are properly characterized as preferences under the Bankruptcy Code and are recoverable.

56. The Committee seeks standing to pursue these causes of action and recoveries.

### The Committee's Demand for the Debtor to Pursue Actions Against Goldman and Demasi

57. Prior to filing the Complaint, the Committee sought the Debtor's consent to pursue disgorgement and recovery of the payments made to Goldman and Demasi.

58. The Complaint insofar as it seeks a declaration that the Goldman Liens are invalid and that segregated funds should be returned to the Debtor was authorized by the Court in its ruling on

October 13, 2016.

59. The Complaint insofar as it constitutes an objection to the Goldman and Demasi claims is permissible under 11 U.S.C. § 502(a) and Rule 3007 of the Federal Rules of Bankruptcy Procedure.

60. The Committee did not assert claims in the Complaint for disgorgement of and recovery of payments made, as it believed the Debtor has standing to assert those claims. The Committee believes it would be efficient to include such causes of action in its Complaint since the facts would be the same to support those actions.

61. Committee counsel sent an e-mail to Debtor's counsel on November 30, 2016 requesting consent to allow the Committee to sue for the avoidable transfers. There was no response. On December 5, 2016, Committee counsel sent another e-mail requesting the conveyance of standing to the Committee to pursue the transfers. Again, there was no response. On December 19, 2016, Committee counsel made a third request and was ignored for the third time. *See* <u>Exhibit G</u>.

62. The Debtor and Goldman and Demasi have entered into a settlement agreement to resolve all claims. The first time the Committee even heard about a settlement was in open Court at a hearing on January 18, 2017.

63. Clearly, the Debtor has no intention of pursuing any actions against Demasi and Goldman despite its fiduciary duty to do so.

**<u>Newly Discovered Evidence of Fraud</u>**

64. On October 31, 2016, the Committee filed a Request for documents pursuant to Fed.R.Civ P. 2004 seeking corporate and financial documents from the Debtor. Doc. No. 121. The Court granted the request by Order dated November 4, 2016. Doc. No. 125.

65. Despite multiple e-mail and telephone requests, the Debtor failed to comply with the order until January 6, 2017 when it provided a link to Debtor's computer drive on which the documents were stored. The documents were not organized in a responsive fashion and were a jumbled compilation of documents all dumped together.

66. Nevertheless, the Committee has begun sorting through what has been provided. In the search, it discovered an elaborate scheme apparently devised and/or implemented by Demasi and Goldman designed to defraud creditors.

67. The scheme sprang from the Debtor's acquisition of Nitro Petroleum, Inc. on January 1, 2015. As the Court may recall, Nitro filed a Chapter 11 proceeding on July 20, 2016 asserting that Nitro was a wholly owned subsidiary of the Debtor pursuant to an "Agreement and Plan of Merger" between Core, Core Resource Management Holding Co. and Nitro dated as of August 27, 2014. Goldman's time records in its POC reflect that it and Demasi were responsible for drafting the merger and related documents.

68. However, Nitro did not emerge from the August 2014 transaction as a separate legal entity. Rather, the Debtor acquired all of Nitro's assets and liabilities. An Order making such findings and dismissing the Nitro case was entered on October 31, 2016. Doc. No. 123.

69. Based on a December 31, 2014 Nitro Accounts Payable Report, Nitro had over $400,000 in outstanding liabilities. Core was unable to service the new debt load and maintain its assets to ensure continued revenue.

70. E-mails between counsel and Core board members support discussions about whether it was illegal for a subsidiary of Core to place a lien on wells formerly belonging to Nitro.

71. On April 9, 2015, Demasi organized Vertice Petroleum, LLC ("Vertice") in the state of Nevada with Goldman Advisers, LLC as the managing member. *See* <u>Exhibit H</u>.

72. On April 21, 2015, Vertice filed a number of mechanic's liens against certain wells owned by Core and/or Nitro. There was no basis for the liens as Vertice did not provide any services at all, much less with respect to the oil wells as required by Oklahoma law.

73. Vertice gave notice of these liens to Oklahoma Petroleum Allies, Inc. ("OPA"), the company used by the Debtor to receive payments from oil purchasers and then pay them to the proper parties. As a result of the Vertice liens, OPA forwarded the monies to Vertice instead of to Core. Vertice then wired the funds back to Core.

74. This, of course, caused any legitimate mechanic's lien creditors to be inferior in interest to the liens of Vertice.

75. While not a complete picture of the Vertice transactions, the Vertice bank statements produced which cover May 11, 2015 through August 14, 2015 show that $123,635 was deposited by OPA to this Vertice bank account. *See* <u>Exhibit I</u>. However, only $121,217.00 was funneled back to

the Debtor and out of the reach of creditors. Notably, the Vertice bank accounts were used for personal expenses including restaurants and nail salons.[2]

76. Per the Debtor's reconciliation of the OPA payments deposited in the Vertice account, approximately $34,750.38 was diverted by Demasi and/or Goldman. *See* <u>Exhibit J</u>.

77. On August 20, 2015, Vertice gave notice of satisfaction of the liens on the Core/Nitro wells. It appears this action was against the wishes of Debtor's management. *See* Exhibit E at ¶ 8.

78. Apparently, Goldman/Demasi caused the Vertice liens to be released in order to assume the first priority position because on September 14, 2015, Goldman recorded a mechanic's lien against the Giant Lease and the Quinlan Lease.

79. The Committee has had insufficient time to research and initiate discovery as to who in Debtor's management knew of this illegal scheme and were complicit in its implementation. However, what is clear is that Demasi, through Goldman, set up a separate entity to establish liens and divert money away from creditors.

80. The Committee seeks standing to pursue these fraud claims.

**The Debtor's Settlement**

81. On January 20, 2017, the Debtor filed its *Motion to Approve Rule 9019 Compromise and Settlement* ("9019 Motion") requesting Court approval of a Settlement Agreement by and between the Debtor, Goldman and Demasi.

82. As part of the settlement, the parties request the Court to dismiss the Complaint with prejudice. The Debtor is not a party to the Complaint; the Committee is not a party to the Settlement Agreement. There is no basis to approve the Settlement Agreement over the objection of the Committee and shockingly, the 9019 does not mention the Complaint or address any of its allegations.

83. The essential terms of the Settlement Agreement are as follows:

 a. Goldman will receive an allowed secured claim in the amount of $56,500 secured by first position liens on the Giant and Quinlan leases and wells and oil and gas production and proceeds

---

[2] Bank statements have been redacted for no explained reason.

thereof and an allowed unsecured claim of $61,388. This is $10,000 higher than the filed Goldman POC.

  b. Goldman will receive an allowed interest for 160,000 shares of common stock.

  c. Goldman will receive 5% of the gross payment from the purchaser of oil from Quinlan and Giant until a plan is confirmed and a minimum $2,000/month thereafter.

  d. Demasi will receive a priority Claim of $6,425 and an allowed general unsecured claim of $69,475. If it is the only priority wage claim, it will be paid in 36 months in equal installments or share pro rata with others if any.

  e. Goldman and Demasi will receive full releases of all claims known and unknown.

84. The 9019 Motion makes no attempt to satisfy the Ninth Circuit requirements for approving settlements as set forth in *In re Woodson*, 839 F.2d 610 (9th Cir. 1988). These include a discussion of (1) the probability of success on the merits, (2) the complexity of the litigation involved, (3) the likely difficulties in collection, (4) the expense, inconvenience and delay necessarily attendant to the litigation and collection, and (5) the paramount interest of the estate. Ultimately, the Debtor cannot satisfy the overarching requirement that the settlement is reasonable and in the estate's and creditors' best interests.

85. To begin, the Debtor states that it has spent a fair amount of time reviewing and researching issues and the possible litigation, that it has consulted with counsel and its financial advisor, and that negotiations have been extensive and well thought out.

86. This is blatantly untrue. The Debtor's own statements in the recently filed MOR and its pre-petition analysis of the Goldman/Demasi claims show that it believed that no monies were due to Goldman or Demasi. The Debtor has not contacted Committee counsel or Committee members to discuss any of the Goldman/Demasi issues. When the Committee first wanted to pursue fraudulent conveyances against Goldman/Demasi, Debtor's counsel admitted he had never looked at the transfers but stated he believed Goldman/Demasi was not owed any monies. The Debtor's financial advisor could not have participated in extensive negotiations over the past months because he was not hired until December and only recently approved. Neither Debtor nor its counsel, have ever mentioned the Vertice scheme and the Committee suspects it has been kept hidden.

87. The 9019 Motion makes no attempt to explain on what authority it can settle litigation it is not a party to or to analyze the claims in the Complaint. Debtor offers no reason why the Goldman Liens should be protected or why the Goldman and Demasi Agreements should not be deemed void as a matter of law.

88. The Allowed Claims of Goldman and Demasi under the Settlement Agreement are significant and well in excess of the risk of the expense of litigation. These claims are amplified in light of the fact that the Debtor has repeatedly asserted that it does not believe Goldman and Demasi are owed any money.

89. Debtor proposes to give Goldman and Demasi broad releases of liability despite the fact that it was likely aware of Goldman's and Demasi's bad acts. Now that the evidence of Goldman and Demasi's actions with respect to setting up a sham company to defraud creditors has surfaced, it is even more critical that the 9019 Motion is denied.

90. The Debtor states that the settlement benefits the Debtor because

    a. it reduces the face amount of the Lien (the reduction is for a mere $27,000);

    b. that it improves cash flow by basing settlement payments on 5% of the Debtor's oil production (an undisclosed amount);

    c. that if Goldman prevailed in litigation, the Goldman Liens would be foreclosed (then why does the settlement include $10,000 in fees to Goldman's counsel if it is "oversecured"; in any event, there is no disclosed value of the wells in question);

    d. that litigation could ensue in Oklahoma (untrue since the Goldman and Demasi Agreements both provide that they are governed by Arizona law, the fraud perpetrated on creditors was orchestrated and carried out in Arizona, the challenge to the validity of the Goldman Liens and the fraudulent conveyances are core issues properly before the Arizona Bankruptcy Court).

91. The Debtor has failed to demonstrate any urgency for this settlement. The matters should be addressed in due course in the Adversary Proceeding.

**The Recovery Under the Complaint**

92. The causes of action against Goldman and Demasi are strong and for the most part, proof will require little in the way of evidence and witnesses.

93. The question regarding the validity and enforceability of the Goldman Liens under Oklahoma law has been fully briefed. If the Court permits evidence on this issue, it will entail only the Consulting and Employment Agreements and the testimony of Goldman and Demasi and the Debtor's representatives.

94. Similarly, with respect to proving the unauthorized practice of law and unenforceability of the Consulting and Employment Agreements, the time records and other correspondence along with the testimony of Demasi and the Debtor's representatives will be sufficient.

95. The fraudulent conveyances are presented easily with bank records and invoices and the testimony of Demasi and the Debtor's representatives.

96. The fraud claims are also quickly tried with the documentary evidence of the liens, the bank statements, the e-mail correspondence and the testimony of Demasi, the Debtor's representatives and possibly the Debtor's former officers.

97. The benefit will be that the Liens will be released, the segregated monies will be returned to the Debtor, Demasi and Goldman will be required to return to the Debtor over $200,000, plus damages for the fraudulent diversion of monies.

98. The Committee has not had the opportunity to fully assess the collectability of Goldman and Demasi or explore the possibility of insurance coverage. However, even if Goldman and Demasi are uncollectible, the Debtor will not being paying out money and the Goldman Liens will no longer be an impediment to other legitimate lenders.

99. This is a case in which the Avoidance and fraud actions may be the only avenue to recovery for unsecured creditors.

## LEGAL ARGUMENT

100. In certain circumstances, a creditors' committee may be authorized by the court to prosecute an action belonging to the bankruptcy estate. *In re Curry and Sorensen*, 57 B.R. 824 (9th Cir. BAP 1986). This typically occurs if the debtor-in-possession fails or refuses to act. *Official Unsecured Creditors Committee of Suffola Inc., v. U.S. National Bank (In re Suffola Inc.)* 2 F.3d 977, 979 n.1 (9th Cir. 1993)(committee may obtain derivative standing to bring preference action when trustee or chapter 11 debtor in possession unjustifiably fails to do so)(reversed on other grounds).

Some courts have recognized a duty on the part of the creditor's committee to take action for the benefit of the estate when the debtor fails to do so. *In re First Capital Holdings Corp*., 146 B.R. 7, 11 (Bankr.C.D.Cal. 1992). Recognizing that if the committee believes the debtor has failed to fulfill its duty to prosecute actions, the committee has an obligation to bring this to the attention of the Court. *Id.*

101. Courts have found that 11 U.S.C. § 1103(c)(5) grants creditor's committees an implied right to initiate adversary proceedings. *In re Catwil Corp*., 175 B.R. 362, 364 (Bankr.E.D.Cal. 1994). While the Ninth Circuit has not adopted a definitive standard to guide the Court on when to grant standing to sue to the committee, the Ninth Circuit BAP has held that standing is appropriate where the proposed litigation is necessary and beneficial. *In re Spaulding Composites Co., Inc.,* 207 B.R. 899, 904 (9th Cir. BAP 1997).

102. Here, the Committee seeks to standing to pursue the recovery of significant funds from Goldman and Demasi. The Debtor has refused to pursue the estate's claims against Goldman and Demasi and, as described above, plans to provide broad releases of all liability to known fraudfeasors. The Committee requested standing to pursue the claims to no avail.

103. The Committee should be authorized to pursue the claims as the litigation will benefit the estate. At a minimum, the Committee is confident that the claims of Goldman and Demasi will be disallowed. Even if any judgment in favor of Goldman and Demasi is not fully collectible, the benefit to the estate is greater because the Debtor will not be paying out any monies to Goldman and Demasi and they will not have a further opportunity to attempt to defraud the Debtor after a plan is confirmed.

104. Granting the Committee authority to pursue the claims against Goldman and Demasi necessarily requires the Court to deny the 9019 Motion. The Committee will file a separate objection to the 9019 Motion.

### **CONCLUSION AND REQUESTED RELIEF**

A bankruptcy debtor is a fiduciary for creditors. As such, the goals of the committee and the debtor should be aligned and both should seek to maximize recovery for creditors of the estate. This case presents the unfortunate situation where the Debtor is not acting in the best interests of the estate

and either through misfeasance or mal intent, has failed to fulfill its fiduciary duty to legitimate creditors of the estate. The Committee has an obligation and a duty to inform the Court of these failures and to seek authority to take steps where the Debtor refuses to do so. Accordingly, based on the foregoing, the Committee respectfully requests that the Court authorize it to bring any additional available actions against Goldman and Demasi.

DATED this 30th day of January, 2017.

**DICKINSON WRIGHT PLLC**

By: */s/ Carolyn J. Johnsen*
Carolyn J. Johnsen
Katherine Anderson Sanchez
*Attorneys for Committee of Unsecured Creditors*

| | |
|---|---|
| 1 | **COPY** of the foregoing served this 30th day of January, 2017, via email on the following parties: |
| 2 | |
| 3 | Adam E. Hauf |
| 4 | Hauf Law, PLC.<br>4225 W. Glendale Ave., Suite A-104 |
| 5 | Phoenix, AZ  85051<br>adam@hauflaw.com |
| 6 | *Attorneys for Debtors Core and Nitro* |
| 7 | U.S. Trustee |
| 8 | Office of the U.S. Trustee<br>230 North First Ave., Suite 204<br>Phoenix, AZ  85003 |
| 9 | USTPRegion14.px.ecf@usdoj.gov |
| 10 | Patty Chan |
| 11 | Office of the United States Trustee<br>230 North First Ave., Suite 204<br>Phoenix, AZ  85003 |
| 12 | Patty.chan@usdoj.gov |
| 13 | Cathy L. Reece |
| 14 | Fennemore Craig, P.C.<br>2394 East Camelback Road, Suite 600 |
| 15 | Phoenix, AZ 85016<br>*Attorneys for Goldman Advisers, LLC* |
| 16 | creece@fclaw.com |
| 17 | */s/ K.A. Sanchez*<br>PHOENIX 72244-1 348339v1 |